TONY FRANCOIS (184100)
PETER PROWS (257819)
BRISCOE IVESTER & BAZEL LLP
235 Montgomery Street, Suite 935
San Francisco, CA 94104
Tel (415) 402-2700
tfrancois@briscoelaw.net
pprows@briscoelaw.net

Attorneys for Plaintiff
CALIFORNIA CATTLEMEN'S ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA CATTLEMEN'S ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, DEB HAALAND, in her capacity as Secretary of the United States Department of the Interior, UNITED STATES NATIONAL PARK SERVICE, and CHUCK SAMS, in his capacity as Director of the National Park Service,<br><br>Defendants. | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1. This lawsuit seeks a temporary restraining order and preliminary and permanent injunction to enjoin the November 21, 2024 illegal decision of the National Park Service to remove the Elk Fence that ensures that the large herd of Tule Elk in the Tomales Point Area of the Point Reyes National Seashore remain in that area and do not migrate into the Pastoral Zone of the Point Reyes National Seashore where said Elk will devastate the Pastoral Zone's environment and the ongoing ranching operations of the families who sold the land to create the National Seashore, and whose operations are a statutorily protected purpose of the National Seashore.

2. Plaintiff California Cattlemen's Association is informed that the bulldozing and removal of the fence is underway as of the filing of this lawsuit. **Plaintiff's members need immediate relief from the harms that the migration of Tule Elk from the Tomales Point Area into the Pastoral Zone will cause**. Plaintiff will be filing at its earliest opportunity an application for temporary restraining order preventing further removal of the fence and restoration of the removed portions, and an order to show cause setting a briefing schedule and hearing on a motion for preliminary injunction preventing further removal of the fence and restoration of any removed fence during the pendency of this litigation.

3. Plaintiff's investigation and analysis of the case remains ongoing during the emergency conditions created by the Park Service's ongoing removal of the fence, and Plaintiff reserves the right to amend this complaint to allege additional facts and causes of action as permitted by law, the Federal Rules of Civil Procedure, and the Northern District Local Rules.

# JURISDICTION

4. This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 (judicial review of agency action); 42 U.S.C. §§ 4321, et seq. (National Environmental Policy Act); and 28 U.S.C. § 1331 (civil action arising under the laws of the United States).

5. Plaintiff's members timely submitted comments on the Elk Fence Removal during the NEPA process, at both scoping and at the EA and Draft Decision stages, thereby exhausting all administrative remedies and satisfying its duties under NEPA before filing this suit. There is no available administrative appeal from the Elk Removal Decision.

6. Venue properly lies in this court under 28 U.S.C. § 1391(e), since all defendants are officers or employees, or agencies, of the United States, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district, and the property that is the subject of this action is situated in this judicial district.

**DIVISIONAL ASSIGNMENT**

7. Pursuant to Civil Local Rule 3-2(d), there is a basis for assigning this civil action to the San Francisco Division, as a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Marin County, California, and Plaintiff's members' principal places of business are located in Marin County, California.

8. This lawsuit is related in subject matter to *Resource Renewal Institute, et al v. National Park Service, et al.*, Case No. 3:22-cv-145-MMC, presently pending in this judicial district before Senior U.S. District Judge Hon. Maxine Chesney. Plaintiff will file the appropriate administrative motion required by the Local Rules to relate the two cases promptly.

**PARTIES**

9. The California Cattlemen's Association (CCA) is a non-profit trade association, formed in 1917, that represents California's ranchers and beef producers in legislative and regulatory affairs. CCA's funding is generated almost entirely by voluntary dues paid by members, who in turn determine the direction and policy of the organization. CCA has 38 county cattlemen's association affiliates that serve as a formidable link between the grassroots membership and CCA. The association is also an affiliate of the National Cattlemen's Beef Association with offices in Washington, D.C., and Denver, Colo. CCA is a strong voice that advocates and represents all segments of ranchers and beef producers; dedicated to positively influencing regulations and legislation in Sacramento and Washington, D.C.; and is fueled by members—the more members involved with the association, the greater return on investment for all.

10. A number of the Association's members ranch on the Point Reyes National Seashore under permits issued by the National Park Service. These members timely submitted comments on the Elk Fence Removal during the Park Service's NEPA process for the Tomales Point Area Plan Environmental Assessment, which comments address the claims in this lawsuit. The relief sought in

1  this lawsuit – the restoration of the Elk Fence – would directly benefit these members by preventing
2  the harm that elk will do to their ranches if the Elk Fence is allowed to be removed.

3  11. Defendant Deb Haaland is the Secretary of the U.S. Department of Interior, an agency
4  of the United States. She is named as a defendant in her official capacity.

5  12. Defendant U.S. Department of the Interior is an agency of the United States, within
6  the meaning of 5 U.S.C. § 701(b), charged with managing the public lands and resources in
7  accordance with and in compliance with federal laws and regulations.

8  13. Defendant Chuck Sams is the Director of the U.S. National Park Service, an agency
9  of the United States. He is named as a defendant in his official capacity.

10  14. Defendant U.S. National Park Service is an agency of the United States, within the
11  meaning of 5 U.S.C. § 701(b), charged with managing the public lands and resources in accordance
12  with and in compliance with federal laws and regulations.

## BACKGROUND

### Facts

15. The Point Reyes National Seashore was created by an Act of Congress in 1962. The Seashore was also "created" by the cooperation of ranchers in West Marin County who wanted to see their ranches and way of life permanently preserved in the face of then threatened development in West Marin. The only thing these ranching families asked was that they continue to operate the ranches within a pastoral zone of the National Seashore, for their own families and as a public amenity of the new federal recreational resource. The National Seashore Act specifies that ranching is an essential part of the Seashore, to be protected from conflicting resource uses and available for public enjoyment consistent with the operation of the ranches. The Point Reyes National Seashore includes a Pastoral Zone where the historic ranches operate. It also includes other areas where ranching does not occur and where other uses including wildlife and recreation predominate. Together, the Pastoral Zone and other areas of the Park make a unified whole that honors the inclusion of ranch land for the park and preserves the ranches and ranching lifestyle while also providing thousands of acres of public recreation and wildlife services.

16. Time has passed, and memories have lapsed, and many now forget that the Point

Reyes National Seashore exists because of the cooperation of the original landowners, who only wanted to see their ranches and way of life preserved from development. Currently, many with a different agenda for Point Reyes National Seashore denigrate these ranchers as invaders, corporate usurpers, privatizers of public resources, and polluters, and many efforts have been mounted to remove the ranchers from Point Reyes National Seashore, in "thanks" for their families' caretaking of the land itself.

17. One of the controversies that has been stoked to advance the removal of ranching from the Pastoral Zone at Point Reyes is conflict with Tule Elk in the region. Tule Elk were almost extirpated in the area many decades ago, but were reintroduced in the 1970s. Since then, resource conflicts between elk and cattle in the pastoral zone have been largely managed by keeping Tule Elk out of the Pastoral Zone.

18. The adverse impacts caused by tule elk have been documented for decades. These known impacts were analyzed extensively in various Point Reyes National Seashore environmental assessments and environmental impact statements. Based on the previous Park Service evaluations, as well as other documentation, the adverse impacts that result from Tule Elk access to the Pastoral Zone are many and well known to the Park Service, the ranchers, and many others.

19. Tule elk are grazers, not browsers. They compete directly with cattle and other grazing livestock for naturally growing and cultivated forage, including rangeland grasses in the Pastoral Zone that are allocated for cattle forage. Tule elk regularly knock down cattle fences and other fences. This results in mixing cattle herds among the ranches, having a neighbor's beef bull breeding dairy heifers, allowing livestock to enter roadways risking harm to both those passing in automobiles as well as the livestock.

20. It is also well documented that tule elk force cattle away from feed that ranchers have purchased for the livestock. There have been incidents where elk have gored cattle with their antlers to access cattle water troughs or purchased cattle feed. There are serious transmissible diseases that can be passed between tule elk and cattle. One of these diseases is Johnes (Chronic Wasting Disease). The tule elk are known to carry Johnes. Johnes disease can be devastating to cattle. All of these impacts, and more, have been documented by the Park Service and the California

Department of Fish and Wildlife.

21. Many ranchers at Point Reyes National Seashore have organic or other niche certifications that could be jeopardized by elk incursions on their ranches.

22. These cumulative impacts are devastating to ranching. Profit margins are generally very small on these historic family farms. The extra expenses to rebuild fences, sort cattle, replace lost forage, purchase additional supplementary feed and pay additional veterinary fees, is likely to put the ranchers out of business.

23. The socioeconomic impacts of allowing the introduced elk herds into the ranching area of the Park are large and widespread. The loss of the ranches would eliminate nearly 20% of Marin County's agricultural production. This would result in the loss of agricultural support businesses, for example feed supply stores and veterinarians. As important and often ignored is the obvious loss of jobs for the workers, and, because they live on the ranches, they will lose their homes as well. With the dozens of affected families displaced, it is likely that at least one of the schools in West Marin would need to close.

24. Elk also have negative impacts on the natural environment and on recreational resources at Point Reyes National Seashore. These include reduction of grasslands by overgrazing and their replacement by brush, which increases fire risk; and the above described effect of breaking fences which allows cattle out of pastures and into roadways, creating road hazards and vehicle delays for recreational visitors to the National Seashore. The Tomales Point Area elk herd has no natural predators, so their presence does not restore or approximate any natural pre-settlement condition of the area, and is not in itself beneficial to the environment.

25. Given these dire consequences of unleashing reintroduced elk into the Pastoral Zone, it is unsurprising that under management plans adopted by the Park Service in 1980 and again 1998, the Point Reyes National Seashore has managed the resource conflict between the cattle ranches that founded the Park and the reintroduced elk herds by keeping the two separate. The primary means of keeping the large Tule Elk herd resident in the non-ranching Tomales Point Area at the North end of the Seashore from the immediately adjacent Pastoral Zone is a large (8 foot high) sturdy elk fence.

26. In 2021, the Park Service adopted a management plan for the Pastoral Zone that

COMPLAINT

extended the ranching permits for 20 years. In that plan, the Park Service decided against opening up the Pastoral Zone to use by the elk herd at Tomales Point, and to keep the existing Elk Fence in place that keeps that herd from harming the Pastoral Zone.

### Park Service Decision to Remove Elk Fence

27.     Astonishingly, given the above, on November 21, 2024, following a flawed environmental review process under the National Environmental Policy Act (NEPA), the Park Service decided to remove the Elk Fence (Elk Fence Removal Decision). Immediately. As of this filing the Elk Fence is being actively removed, and the Tule Elk Herd from the Tomales Point Area will have access to the entire Pastoral Zone, and will begin causing the documented harms discussed above.

28.     The unmanaged range land within the Tomales Point Area has become degraded by overgrazing by the elk herd. Open grasslands that were present before NPS evicted the rancher who had been there and introduced the elk have been largely lost. Brush has encroached and elk carrying capacity has diminished. If any portion of the Elk Fence is removed, the elk will likely move quickly onto the productive pastures managed by the ranchers in the Pastoral Zone, a zone set aside for continued ranching. Once outside the elk preserve fence, there is no stopping the elk migration across the entire Pastoral Zone. Elk from the Limantour Wilderness have traveled great distances to inhabit and injure a number of ranches near Drakes Beach. It would be foolish to believe that the Tomales Point herd would not do the same. The Park Service claims that the Limantour elk swam across Drakes Estero to establish a new herd at Drakes Beach. The Tomales Point herd, once released, will have no such barrier to invade all of the Pastoral Zone ranches. They can simply walk in.

29.     Members of Plaintiff California Cattlemen's Association submitted extensive comments on the proposed removal of the Elk Fence at the NEPA scoping stage and again on a draft Environmental Assessment. These comments pointed out the many environmental harms that would occur in the Pastoral Zone if the Elk Fence is removed. These harms are also documented and therefore well known to the Park Service in the NEPA documentation for the 2021 management plan for the Pastoral Zone (which determined not to allow elk from the Tomales Point Area into the

1  Pastoral Zone).

2  30. However, the Park Service limited its review of environmental impacts of removal of
3  the Elk Fence to impacts that would occur within the limited footprint of the Tomales Point Area.
4  Through this stratagem, the Park Service improperly segmented the project it was considering and
5  failed to disclose, analyze, or discuss any of the impacts that it knew would inevitably and
6  immediately occur upon release of the Tomales Point elk herd into the Pastoral Zone upon removal
7  of the fence.

8  31. This improper limitation of environmental review resulted in a failure of the Park
9  Service to consider alternatives that would avoid or minimize these impacts, and a failure to identify
10 measures that would mitigate these impacts. The improper limitation also resulted in a failure of the
11 NEPA documentation to adequately inform the public about the impacts of the decision to remove
12 the Elk Fence, and failure to afford the public with a legally adequate opportunity to comment on the
13 proposed decision.

## NEPA and APA Background

15 32. The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, declares,
16 among other things, "a national policy which will encourage productive and enjoyable harmony
17 between man and his environment," §4321.

18 33. NEPA requires a "detailed statement" (now referred to as an "environmental impact
19 statement" or "EIS") to be prepared for "major Federal actions significantly affecting the quality of
20 the human environment". 42 U.S.C. § 4332(2)(C). The Park Service's actions complained of in this
21 complaint constitute major Federal actions significantly affecting the quality of the human
22 environment, but the Park Service did not prepare an environmental impact statement.

## Administrative Procedure Act

24 34. Pursuant to the Administrative Procedure Act, a court must set aside agency action
25 that: (a) fails to meet statutory, procedural, or constitutional requirements, or (b) is arbitrary,
26 capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)-
27 (D).

28 35. Section 704 of the Administrative Procedure Act states that "[a]gency action made

reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

**INJUNCTIVE RELIEF ALLEGATIONS**

36. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 35 as though fully set forth herein.

37. If an injunction does not issue enjoining Defendants from removing the Elk Fence, restoring any removed portions, and removing any elk from the Pastoral Zone, Plaintiff and its members will be irreparably harmed.

38. Plaintiff and its members have no plain, speedy, or adequate remedy at law.

39. If not enjoined by this Court, Defendants will continue to remove the Elk Fence and release elk into the Pastoral Zone in derogation of Plaintiff's and Plaintiff's members' rights.

40. Accordingly, injunctive relief is appropriate.

**DECLARATORY RELIEF ALLEGATIONS**

41. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 as though fully set forth herein.

42. An actual and substantial controversy exists between Plaintiffs and Defendants as to their legal rights and duties with respect to the APA and NEPA in the context of the Elk Fence Removal Decision.

43. This case is presently justiciable because Defendants' failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to Plaintiff and its members. Plaintiff has a vital interest in knowing whether the Elk Fence Removal Decision is statutorily valid.

44. Declaratory relief is therefore appropriate to resolve this controversy.

**CAUSES OF ACTION**

**COUNT 1: VIOLATION OF NEPA AND THE APA**

45. Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 - 44 of this complaint.

46. Because the EA was "so inadequate a to preclude meaningful analysis," the Park

Service's failure to "prepare and circulate" an adequate EA or DEIS to allow the public a meaningful opportunity to comment on it prior to preparing and releasing the FONSI violates 40 C.F.R. § 1502.9(a).

47. The EA and FONSI do not contain a "full and fair" discussion of the environmental impacts as required by 40 C.F.R. § 1502.1, or the "detailed statement" of effects on the "human environment" required by 42 U.S.C. § 4332(2)(C).

48. The EA and FONSI do not "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts" in violation of 40 C.F.R. § 1502.1.

49. The FONSI does not "respond to comments" or "discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement" or "indicate the agency's response to the issues raised" in violation of 40 C.F.R. § 1502.9(a).

50. The FONSI failed to use data that was essential to a reasons choice among alternatives in violation of 40 C.F.R. § 1502.2.

51. The EA and FONSI limited the planning area to the Tomales Point Area, despite knowing that release of Tule Elk from that Area would have immediate and significant impacts in the Pastoral Zone to which the Elk are being released, thereby deliberately ignoring and not disclosing, studying, or discussing environmental impacts occurring outside of the artificially restricted planning area selected for the EA and FONSI.

52. Based on the foregoing, the decision to remove the Elk Fence is in violation of NEPA and therefore contrary to law and arbitrary and capricious under NEPA and the APA.

## COUNT 2: VIOLATION OF THE APA

53. Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 - 52 of this complaint.

54. The 2021 Pastoral Zone management plan determined not to allow elk from the Tomales Point Area into the Pastoral Zone or to remove the Elk Fence keeping the two areas separated.

55. The Elk Fence Removal Decision reverses that policy without adequate explanation

for the change of policy.

56. The Elk Fence Removal Decision omits information about the harms that elk will do to the Pastoral Zone that is otherwise known to the Park Service and that would have informed its decision had it been considered before the decision was made.

57. The Elk Fence Removal Decision was arbitrary and capricious under the APA.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this court:

1. Issue a temporary restraining order directing the Park Service to stop its removal of the Elk Fence and to take no action that would move any of the Tomales Point Area elk herd toward the existing breach;

2. Issue a temporary restraining order directing the Park Service to restore any portions of the Elk Fence already removed;

3. Issue a temporary restraining order directing the Park Service to remove any elk who have moved into the Pastoral Zone from the Tomales Point Area;

4. Issue an order to show cause setting a briefing schedule and hearing date on a motion for preliminary injunction;

5. Issue a preliminary and permanent injunction ordering the Park Service not to remove any further length of the Elk Fence and to take no action that would move any of the Tomales Point Area elk herd toward the existing breach;

6. Issue a preliminary and permanent injunction ordering the Park Service to restore any portion of the Elk Fence removed;

7. Issue a preliminary and permanent injunction ordering the Park Service to remove any elk who have moved into the Pastoral Zone from the Tomales Point Area;

8. Enter a declaratory judgment that the November 21, 2024, decision of the Park Service to remove the Elk Fence violates NEPA and the APA;

9. Award Plaintiff its costs and attorneys fees;

10. Any other relief as the Court may award.

DATED:  December 3, 2024

BRISCOE IVESTER & BAZEL LLP

By: _____
Tony Francois
Attorneys for Plaintiff
CALIFORNIA CATTLEMEN'S ASSOCIATION